**FOURTH DIVISION**
**DOYLE, P. J.,**
**ANDREWS and BOGGS, JJ.**

NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
(Court of Appeals Rule 4 (b) and Rule 37 (b), February 21, 2008)
http://www.gaappeals.us/rules/

**September 19, 2012**

# In the Court of Appeals of Georgia

A12A1217. PAULK et al. v. THOMASVILLE FORD LINCOLN
MERCURY, INC.

ANDREWS, Judge.

In March 2008, Thomasville Ford Lincoln Mercury, Inc. sold a used Cadillac
to Veronica and James Paulk. After the couple learned that the car had been involved
in a collision and repaired before being sold to them, they sued Thomasville for fraud
and deceit, unfair trade practices, breach of warranty, and revocation of acceptance.
On appeal from the trial court's grant of summary judgment, the Paulks argue that
questions of material fact remain on each of these claims. We disagree and affirm.

On appeal from a grant of a motion for summary judgment, we review the
evidence de novo, viewing it in the light most favorable to the non-movant, to
determine whether a genuine issue of fact remains and whether the moving party is

entitled to judgment as a matter of law. *Rubin v. Cello Corp.*, 235 Ga. App. 250 (510 SE2d 541) (1998).

So viewed, the record shows that in February 2007, the Cadillac at issue in this suit was owned by Alamo Financing, used in the robbery of a pawn shop in Florida, and involved in a rollover accident. The accident caused damage to the car estimated at more than $17,000. By October 2007, Thomasville had acquired the car for $21,500 and performed an inspection without noting that the car had been in a collision. On March 3, 2008, a Thomasville employee requested and obtained a Carfax report on it. The report did not include any information on the February 2007 wreck.

On March 31, 2008, Thomasville sold the Cadillac to Veronica Paulk, whose husband was then deployed in Iraq, for $24,876.98 (including tax, tag and title). At the time of sale, the car had 10,420 miles on it. Ms. Paulk testified that before buying the car, she noticed some discoloration on the inside of the driver's side door next to the steering wheel.

A. I just remember asking if the car had been wrecked and why it looked like that. And [the salesman] proceeded to mention that he – he said he wasn't – that they had just got the lot and the cars were on the lot

2

already and he was – *he said that he was not sure* and that – but it came with a manufacturer's warranty, so that I should, you know, feel safe, pretty much. Well, he didn't say that. But it was basically implying that I should feel safe because it had a manufacturer's warranty. . . . .

Q. [So the salesman's] response was, "We just acquired this car lot. This car was on the lot when we arrived [at] the dealership. *I'm not sure*, but it has a manufacturer's warranty"?

A. Right.

(Emphasis supplied.) When Ms. Paulk was asked whether she thought that Thomasville "knew that this car was wrecked at the time they sold it to you," she replied, "I'm not sure if they did or not." The purchase order signed by Ms. Paulk also noted that she had "examined the vehicle," was "familiar with its condition," and was "buying a used vehicle, as is, and with no warranty as to condition, model or mileage, unless otherwise specified in writing." As the salesman represented, and as a sticker on the car itself also suggested, the Cadillac remained under a manufacturer's warranty at the time of the sale.

A few days after the purchase, Ms. Paulk noticed a wet spot in the Cadillac's trunk. She took the car back to Thomasville, which performed a repair while she

3

waited. Four months later, the gas gauge stuck once; Ms. Paulk restarted the car, and the gauge reset properly. At one point during the next 12 months, the car stalled out once while Ms. Paulk was driving it. In July 2009, the sunroof began leaking. Ms. Paulk took the car to a Cadillac dealership in Savannah, which repaired the leak and replaced upholstery damaged by it. All of these repairs were covered by the manufacturer's warranty. Also in the summer of 2009, the car stalled out at a stop sign while Mr. Paulk was driving. The car restarted, and the problem did not recur.

In the summer of 2009, Mr. Paulk returned from deployment in Iraq and noticed that the paint above the rear passenger door had tape lines, suggesting that the car had been repainted. Mr. Paulk also noticed dirt embedded in the new paint. In October 2009, Mr. Paulk backed into another vehicle and damaged the Cadillac's right quarter panel. The repairman working on that damage told Mr. Paulk that the car had been repaired before and pointed out non-factory paint, applied body filler, and reshaped fenders. On October 14, 2009, Mr. Paulk obtained an AutoCheck vehicle history, which showed that the car had been involved in the February 2007 rollover accident. He immediately contacted Thomasville's manager, who denied that the Cadillac had been wrecked before the sale and refused to repaint the car. The Paulks

4

stopped driving the car shortly afterward, by which time they had put over 24,000 miles on it.

A December 2009 Carfax report showed that the rollover accident had not been reported to that agency until April 1, 2009, or one year after the sale to the Paulks. On December 16, 2009, the Paulks' counsel notified Thomasville of the couple's intention to rescind the contract. In the course of the suit that followed, the Paulks' expert testified that "any person in the used car business would have discovered the previous damage to [the Cadillac] from even a cursory inspection of the vehicle." The expert also reported that the Cadillac was worth $8,000 less than it would have been had it not been in the 2007 collision and repaired as it was.

1. The Paulks argue that Thomasville's failure to discover and disclose the Cadillac's 2007 wreck was fraudulent. We disagree.

"The five elements of fraud and deceit are: (1) false representation made by defendant; (2) scienter; (3) intention to induce plaintiff to act or refrain from acting in reliance by plaintiff; (4) justifiable reliance by plaintiff; and (5) damage to plaintiff." (Citation and punctuation omitted.) *Jegadeesh v. Ryan*, 293 Ga. App. 341, 343 (2) (667 SE2d 105) (2008). "In order to survive a motion for summary judgment, plaintiff must show some evidence as to each element [of a fraud claim]. In order to

5

prove the element of justifiable reliance, the plaintiff must show that he exercised his duty of due diligence." *Hanlon v. Thornton*, 218 Ga. App. 500, 501 (1) (462 SE2d 154) (1995).

The record before us does not authorize a factfinder to conclude that Thomasville knew of the collision or that it made any false representation concerning it. On the contrary, Ms. Paulk's own testimony shows that when she noticed a paint flaw and asked whether the Cadillac had been repaired, the Thomasville representative replied that he was "not sure" about any collision but that she should "feel safe" about purchasing the car because it had a manufacturer's warranty. In fact, Thomasville's own Carfax report, obtained a few weeks before the sale, did not show that the car had been in a collision, and the car did have such a warranty, which the Paulks received the benefit of when they obtained repairs on the car's trunk, sunroof, and upholstery. The purchase order signed by Ms. Paulk also noted that she had "examined the vehicle," was "familiar with its condition," and was "buying a used vehicle, as is, and with no warranty as to condition, model or mileage, unless otherwise specified in writing." Thus the Paulks can prove neither that the salesman's expression of uncertainty concerning the collision was a misrepresentation nor that they were justified in concluding either that the car had not previously suffered body

6

damage or that no further inquiry was necessary on the subject. *Jegadeesh*, 293 Ga. App. at 344 (2) (affirming trial court's grant of defendants' motion for j.n.o.v. concerning fraud claim where defendants had represented that they did not know of any water damage to house; plaintiffs could prove neither a misrepresentation nor justifiable reliance, given their own notice concerning the damage); *El-Amin v. Nalley Motor Trucks*, 215 Ga. App. 509, 510 (451 SE2d 61) (1994) (affirming grant of summary judgment to seller when odometer disclosure statement warned that odometer was incorrect and when the buyer admitted that the seller had told him that he did not know the correct mileage on the vehicle); *Hanlon*, 218 Ga. App. at 502 (1) (affirming grant of summary judgment to seller when plaintiff failed to show due diligence concerning existence of landfills on property).

2. Like a claim for common-law fraud, a claim under the Fair Business Practices Act of 1975 (FBPA), OCGA § 10-1-390 et seq., requires a showing that a defendant committed "a volitional act constituting an unfair or deceptive act or practice conjoined with culpable knowledge of the nature (but not necessarily the illegality) of the act." *Colonial Lincoln-Mercury Sales v. Molina*, 152 Ga. App. 379, 383-384 (11) (262 SE2d 820) (1979). Just as the Paulks cannot show that Thomasville made a fraudulent misrepresentation to them concerning the Cadillac,

7

they cannot show that Thomasville's expression of uncertainty concerning the 2007 collision was unfair or deceptive. See *DeLoach v. Gen. Motors*, 187 Ga. App. 159, 160-161 (5) (369 SE2d 484) (1988) (affirming grant of directed verdict to car dealer on buyer's FBPA claim; dealer's failure to notice defect and refusal to give buyers a new car once the defect was discovered were "not by themselves an unfair or deceptive [business] practice" when the car's "warranty provides a remedy for a breach"); compare *Marrale v. Gwinnett Place Ford*, 271 Ga. App. 303, 309 (3) (609 SE2d 659) (2005) (reversing grant of summary judgment on car buyer's FBPA claim when a salesman "certainly knew that he did not know the real condition of the car," but told a buyer nonetheless that the car had not been in a collision).

3. The Paulks also contend that the trial court erred when it granted summary judgment to Thomasville on their claim for breach of implied warranty and violation of the Magnuson-Moss Warranty Act, 15 USC § 2310 (d) (1). We disagree.

> The Magnuson-Moss Warranty Act allows a "consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under an implied warranty to bring suit for damages and other legal and equitable relief." 15 USC § 2310 (d) (1). The Act defines "implied warranty" as "an implied warranty arising under State law in connection with the sale by a supplier of a consumer product." 15 USC § 2301 (7).

8

(Footnote and punctuation omitted.) *Mitchell v. Backus Cadillac-Pontiac*, 274 Ga. App. 330, 338 (6) (618 SE2d 87) (2005). To recover under the Magnuson-Moss Act, then, a buyer must show that a seller "breached the implied warranty of merchantability arising under Georgia law." Id.

Under Georgia's version of the Uniform Commercial Code, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. This warranty protects consumers from defects or conditions existing at the time of sale." *Dildine v. Town & Country Truck Sales*, 259 Ga. App. 732, 733-734 (1) (577 SE2d 882) (2003), citing OCGA § 11-2-314 (1). To be merchantable, used cars must "pass without objection in the trade under the contract description, and they must be fit for the ordinary purposes for which cars are used." *Soto v. CarMax Auto Superstores*, 271 Ga. App. 813, 815 (1) (b) (611 SE2d 108) (2005), citing OCGA § 11-2-314 (2) (a), (c). "Proof that [a] car was defective when sold is an essential element of this claim." *Mitchell*, 274 Ga. App. at 338-339 (6).

As was the case with the buyer in *Mitchell*, the Paulks have cited no authority for their proposition that the mere fact that a car has been repaired after a collision would cause it not to "[p]ass without objection in the trade under the contract

description." OCGA § 11-2-314 (2) (a). Here, for example, Thomasville paid $21,500 for the car shortly before selling it to the Paulks, showing that it indeed passed without objection in the trade before being offered to a consumer for sale. Finally, the other defects of which the Paulks complained – two stalls, defective paint, and a leaky trunk and sunroof, now repaired – do not amount to defects making the Cadillac unmerchantable, particularly in light of their use of the car for over 24,000 miles. It follows that the Paulks have not shown error in the trial court's grant of summary judgment on their FBPA and Magnuson-Moss claims. *Soto*, 271 Ga. App. at 815 (fact that buyer drove car for 25,000 miles "negates his claim that the vehicle was unmerchantable at the time of purchase, since it clearly was capable of being driven"); *Sharpe v. Gen. Motors*, 198 Ga. App. 313, 314-315 (3) (401 SE2d 328) (1991) (given that an FBPA claim failed, a Magnuson-Moss claim, which concerned "damages, not liability," also failed).

4. Finally, the Paulks argue that questions of material fact remain on their revocation of acceptance claim. Again, we disagree.

Under OCGA § 11-2-608 (1), a buyer may revoke acceptance of a product "whose nonconformity substantially impairs its value to him" if that buyer accepted the product

10

(a) [o]n the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) [w]ithout discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

Subsection (2) of the same statute provides that a buyer's revocation of acceptance "must occur within a reasonable time after the buyer discovers or should have discovered the ground for it *and* before any substantial change in condition of the goods which is not caused by their own defects." (Emphasis supplied.)

We are aware that questions whether an effective revocation of acceptance has been made, whether reasonable notification was given to the seller, and whether the value of the goods was substantially impaired by a nonconformity are ordinarily matters for the trier of fact. See *Griffith v. Stovall Tire & Marine*, 174 Ga. App. 137 (329 SE2d 234) (1985). Pretermitting whether the Cadillac was nonconforming at the time it was sold to the Paulks, however, their own undisputed evidence showed that Ms. Paulk saw paint defects immediately on opening the driver's door to the car and before purchasing it; that this discovery led her to inquire whether the car had been in a collision; and that the salesman replied that he was "not sure" on this point. The

11

record also shows that the Paulks's attempted revocation came long after they put thousands of miles on the car. Thus the Paulks can show neither that their acceptance was induced by the difficulty of discovering the car's defects nor that their attempted revocation came after they had notice of those defects but before a substantial change in the car's condition. See *Bicknell v. B & S Enterprises*, 160 Ga. App. 307, 309 (2) (287 SE2d 310) (1981) (affirming car dealer's motion for directed verdict when that dealer "did nothing to conceal the condition" of the car sold to plaintiff; "[g]iven the ease with which the plaintiff could have discovered the alleged nonconformance," she had "no grounds to revoke her acceptance" of the car).

For all these reasons, the trial court did not err when it granted Thomasville summary judgment on the Paulks' claims.

*Judgment affirmed. Doyle, P. J., and Boggs, J., concur.*